138 P.3d 1201

**SCHUCK & SONS CONSTRUCTION, Petitioner Employer,**

**Schuck & Sons Construction c/o RSKCO Claims, Petitioner Carrier,**

v.

**The INDUSTRIAL COMMISSION of Arizona, Respondent,**

**Daniel Bojko, Respondent Employee.**

**No. 1 CA–IC 05–0058.**

Court of Appeals of Arizona, Division 1, Department C.

July 27, 2006.

Cross & Lieberman, PA By Lawrence H. Lieberman, Phoenix, Attorneys for Petitioners Employer and Carrier.

Laura L. McGrory, Chief Counsel, The Industrial Commission of Arizona, Phoenix, Attorney for Respondent.

Ely Bettini, Ulman & Rosenblatt By Cindy L. Padilla, Phoenix, Attorneys for Respondent Employee.

## OPINION

BARKER, Judge.

¶ 1 Petitioner Employer Schuck & Sons Construction ("Schuck") filed this special action to appeal an Industrial Commission of Arizona ("ICA") decision affirming its earlier decision finding Daniel Bojko ("Bojko") to have an unscheduled permanent partial disability entitling him to an award of $536.57 per month.[1] Schuck argues that the Administrative Law Judge ("ALJ") erred by failing to consider Bojko's self-employment earnings when determining his post-injury earning capacity.[2] We reverse and remand for further proceedings consistent with this decision.

### Factual and Procedural History

¶ 2 While employed as a framing carpenter with Schuck, Bojko was injured on November 30, 1998 when a four-hundred pound beam fell from a forklift and struck his neck. At the time of the injury, Bojko also owned and was "engaged" in a business, D & D Builders ("D & D"). However, the record is unclear as to Bojko's level of involvement in the business and whether the business had any revenue in 1998.

¶ 3 As a result of the injury, Bojko underwent neck surgery but continues to experience back pain and a decreased range of motion in his neck. Bojko takes pain medication that causes him to "space out" and is subject to limitations on lifting and the number of hours he can work each day.

¶ 4 Bojko's workers' compensation claim was accepted for benefits, and on December 17, 1998, Schuck recommended an average monthly wage of $2,100.00, the statutory maximum, based on Bojko's annual salary of $32,480.76. Any earnings Bojko may have had from D & D were not considered. The ICA adopted Schuck's recommendation, and on January 15, 1999, issued a notice of average monthly wage in the amount of $2,100.00. This figure is not in dispute.

¶ 5 Effective May 15, 2002, Schuck closed the claim with an unscheduled permanent partial impairment and a supportive care award. On October 2, 2002, the ICA concluded that Bojko suffered an unscheduled permanent partial disability resulting in a 14% general physical functional disability and a 10.62% loss of earning capacity, entitling him to $122.62 per month. Bojko timely protested that he had sustained a greater loss of earning capacity.

¶ 6 After hearing,[3] the ALJ ruled that the "equal measure rule" precluded consideration of post-injury self-employment earnings from D & D when determining Bojko's earning capacity because self-employment earnings from D & D were not considered when establishing Bojko's average monthly wage. The ALJ reasoned:

4. An Applicant's loss of earning capacity must be measured by the same standard as the average monthly wage on the date of injury. *Whyte v. Industrial Comm'n*, 71 Ariz. 338, 344, 227 P.2d 230, 233 (1951).

. . . .

16. Based upon [the] equal measure doctrine as outlined in *Whyte, supra* and *Elias [v. Industrial Commission*, 175 Ariz. 507, 858 P.2d 652 (1992) ], the same standard in calculating Applicant's average monthly wage should be used in calculating Applicant's loss in earning capacity. The undersigned finds that Applicant's self employment for D & D Construction should not be used in determining [sic] his current loss in earning capacity. Further based upon *Faulkner v. Industrial Commission*,

---

1. Schuck was self-insured at the time of Bojko's injury.

2. For the purposes of this decision, unless otherwise indicated, "earning capacity" shall mean Bojko's post-injury earning capacity, and "average monthly wage" shall refer to Bojko's pre-injury average monthly wage as applied in Arizona Revised Statutes ("A.R.S.") section 23–1044(C),(D) (Supp.2005).

3. Testimony was given by Bojko, two physicians, and two labor market experts.

71 Ariz. 76, 223 P.2d 905 (1950), it was appropriate not to include Applicant's concurrent self employment with any determination of his average monthly wage at the time of the 1998 industrial injury.

¶ 7 The ALJ found a 46.45% loss of earning capacity entitled Bojko to $534.57 per month in permanent benefits. The ALJ explained his conclusion:

> With respect to jobs Applicant would be able to perform, in the open and competitive labor market that would be available and suitable to him, that of a gate guard as outlined by Mr. Kelman is the most appropriate. The undersigned also concludes, using the reasoning from Dr. Barranco's testimony that Applicant may be able to work up to six hour[s] per day and 30 hours work week [sic]. Mr. Kelman indicated that a rollback wage of $8.65 per hour is appropriate for the gate guard position. At 30 hours a week, that translates to a loss in earning capacity of $975.59 which equals an entitlement of $536.57 per month in permanent benefits and a 46.45% loss in earning capacity.

¶ 8 Schuck protested that the ALJ erred by failing to consider Bojko's self-employment earnings from D & D when determining his earning capacity. On review, the ALJ affirmed and supplemented the earlier decision. The ALJ again found a 46.45% loss of earning capacity, based on work as a gate guard, entitled Bojko to $536.57 per month based on a 30–hour work week.

¶ 9 The revised decision affirmed the exclusion of self-employment earnings based on the equal measure rule. It also supplemented the earlier decision with alternative grounds for excluding self-employment earnings from the determination of earning capacity.

¶ 10 The ALJ, quoting *Mail Boxes, etc. v. Industrial Commission*, 181 Ariz. 119, 123, 888 P.2d 777, 781 (1995), stated the rule

that a sole proprietor's average monthly wage is "measured by the market value of services rendered." The ALJ then reasoned that because "both labor market consultants agreed that applicant's position at D & D Builders [was] not available in the open and competitive labor market," the market value of the labor Bojko performed for D & D could not be ascertained and therefore the position could not "be used as a measure of applicant's earning capacity." The decision also excluded self-employment earnings based on the ALJ's conclusion that these were business profits that would inappropriately characterize Bojko's earning capacity and using profit from only one year would result in endless litigation by prompting continuous petitions for rearrangement.[4]

¶ 11 Schuck timely filed this special action. This court has jurisdiction pursuant to A.R.S. §§ 12–120.21(A)(2) (2003), 23–951(A) (1995), and Arizona Rule of Procedure for Special Actions 10.

### *Standard of Review*

¶ 12 This court deferentially reviews factual findings of the ICA but independently reviews its legal conclusions. *PFS v. Indus. Comm'n*, 191 Ariz. 274, 277, 955 P.2d 30, 33 (App.1997). Reasonably supported factual findings will be affirmed, even if we disagree with them. Id.; *Micucci v. Indus. Comm'n*, 108 Ariz. 194, 195, 494 P.2d 1324, 1325 (App.1972).

¶ 13 We construe the Workers' Compensation Act liberally in order to effectuate its remedial purpose. *Young v. Indus. Comm'n*, 204 Ariz. 267, 270, ¶ 14, 63 P.3d 298, 301 (App.2003). When an ICA award is set aside, for any reason, it must usually be set aside in its entirety. *Felix v. Indus. Comm'n*, 193 Ariz. 152, 155 n. 2, ¶ 15, 971 P.2d 199, 202 n. 2 (App.1998).

---

4. Rearrangement is a procedure whereby either party can petition the ICA to exercise its continuing jurisdiction over workers' compensation claims to reconsider an award upon a showing of (1) a change in the claimant's physical condition that arises from the injury, (2) a reduction in the earning capacity of the claimant that arises from

the injury when there is no change in physical condition, and (3) a showing that the claimant's earning capacity has increased. *Pima County Bd. of Supervisors v. Indus. Comm'n*, 149 Ariz. 38, 44, 716 P.2d 407, 413 (1986); A.R.S. § 23–1044(F) (Supp.2005).

### Discussion

¶ 14 To receive an award for an unscheduled permanent partial impairment, Bojko must prove that the industrial injury resulted in a loss of earning capacity.[5] If he establishes a loss of earning capacity attributable to his injury, he is entitled to an award in an amount equal to 55% of the difference between his pre-injury average monthly wage and his post-injury earning capacity, subject to the statutory maximum. Id.; A.R.S. § 23–1044(C) (Supp.2005).

¶ 15 In determining Bojko's earning capacity, the ALJ excluded Bojko's self-employment earnings from D & D based on the following conclusions: (1) they were barred under the equal measure rule; (2) Bojko's actual earnings from D & D could not be ascertained in the open market; and (3) the monies were business profits and using profits from only one year would result in endless litigation. We consider Schuck's challenges below.

### 1. The Equal Measure Rule

¶ 16 The ALJ ruled that the equal measure rule barred consideration of Bojko's self-employment earnings when determining his post-injury earning capacity because earnings from D & D were not considered in determining Bojko's average monthly wage at the time of injury. Essentially, the ALJ applied the equal measure rule to preclude consideration of a specific type of employment available to Bojko post-injury. This was error.

¶ 17 First, in determining a claimant's post-injury earning capacity, the court must consider any type of work that a claimant is able to perform. *Warren v. Indus. Comm'n,* 202 Ariz. 10, 13, ¶¶ 14–16, 39 P.3d 534, 537 (App.2002). *See generally White v. Indus. Comm'n,* 87 Ariz. 154, 156, 348 P.2d 922, 924 (1960); *Wimmer v. Indus. Comm'n,* 26 Ariz. App. 524, 549 P.2d 619 (1976); *Schmitz v. Indus. Comm'n,* 26 Ariz.App. 404, 405–06,

549 P.2d 184, 185–86 (1976). As we stated in *Warren,*

> A worker may be totally disabled from his or her primary vocation, but if he or she retains the capacity to perform *any suitable, reasonably available* work that pays the equivalent of the statutory maximum average monthly wage, then the worker has no loss of earning capacity despite the total disability to perform the date of injury work.

202 Ariz. at 13, ¶ 16, 39 P.3d at 537 (emphasis added).

¶ 18 Second, the equal measure rule is a decisional rule of reciprocity that requires a claimant's "average monthly wage and post-injury earning capacity ... be measured by the same 'yardstick.' " *Id.* at 12, ¶ 14, 39 P.3d at 536; *Whyte,* 71 Ariz. at 344, 227 P.2d at 233. The rule operates to eliminate the unequal application of specified factors from the determination of post-injury earning capacity to ensure that the comparison with pre-injury monthly wage is equitable. Id. It does not, however, apply to eliminate different types of work or employment in which an employee may engage (or increase his involvement in) post-injury. *See id.*

¶ 19 The rule has been applied to ensure that when comparing average monthly wage and earning capacity, the courts adjust for inflation and consider factors such as the length of a claimant's work week, the number of hours worked, the regularity of work, and whether compensation includes or excludes expenses associated with the job (such as travel). *See Whyte,* 71 Ariz. at 344, 227 P.2d at 233 (applying the equal measure rule to adjust for inflation); *Warren,* 202 Ariz. at 12, ¶ 14, 39 P.3d at 536 (applying the equal measure rule to hold that when an average monthly wage does not include overtime then post-injury earning capacity may not include overtime); *Elias,* 175 Ariz. at 509, 858 P.2d at 654 (holding that when worker's average monthly wage was based on part-time work,

---

5. For the purposes of the Workers' Compensation Act, "disability" means a loss of earning capacity attributable to an industrial injury. The cases use these terms interchangeably. *Tartaglia v. Indus. Comm'n,* 177 Ariz. 199, 201, 866 P.2d

867, 869 (1994); *Aquino v. Indus. Comm'n,* 8 Ariz.App. 444, 446, 447 P.2d 259, 261 (1968); *Universal Roofers v. Indus. Comm'n,* 187 Ariz. 620, 622, 931 P.2d 1130, 1132 (App.1996).

the equal measure rule required that earning capacity also be based on part-time work); *Oak Indus. v. Indus. Comm'n,* 153 Ariz. 608, 610–11, 739 P.2d 829, 831–32 (App.1987) (applying the equal measure rule to account for expenses); *Ariz. Pub. Serv. Co. v. Indus. Comm'n,* 16 Ariz.App. 274, 278, 492 P.2d 1212, 1216 (1972) (applying the equal measure rule to overtime and backpay); *Laker v. Indus. Comm'n,* 139 Ariz. 459, 463–64, 679 P.2d 105, 110–11 (App.1984) (applying equal measure rule to shift pay differentials).

¶ 20 Here, however, the ALJ used the rule to exclude altogether earnings and potential earnings from a particular type of employment: Bojko's business as a self-employed building contractor. The equal measure rule does not operate in this fashion. As noted, when considering post-injury earning capacity, the ALJ must consider "any suitable, reasonably available work." *Warren,* 202 Ariz. at 13, ¶ 16, 39 P.3d at 537. Whether the type of work now at issue was or was not considered in computing average monthly wage pre-injury does not invoke the equal measure rule. To illustrate this point, an example showing how the equal measure rule could be invoked in this case may be helpful.

¶ 21 Suppose Schuck asserted that Bojko's *post*-injury earning capacity should be based on working full-time (as he did previously for Schuck) *plus* working part-time for D & D. Also suppose that Bojko's *pre*-injury average monthly wage was based on only full-time employment (for Schuck) and did not include part-time employment (for D & D). Under that scenario, the equal measure rule would preclude considering full-time employment plus part-time employment in the one instance (post-injury loss of earning capacity) when only considering full-time employment in the other instance (pre-injury average monthly wage). *See Elias,* 175 Ariz. at 509, 858 P.2d at 654. This is what the Arizona Supreme Court meant when it initially in-voked the rule and said such a circumstance was "comparable to the use of a 3–foot yard stick for measuring his earning capacity before the accident [full-time employment in our example] and a 5–foot yard stick for measuring his earning capacity after the accident [if full-time plus part-time employment were sought]." *Whyte,* 71 Ariz. at 344, 227 P.2d at 234.

¶ 22 Here, the employer is asserting the use of the same 3–foot yard stick: full-time employment for both pre-injury and post-injury calculations. Simply because Bojko worked part-time as a contractor before the incident does not mean that the employer is precluded from asserting that this *type* of employment is now the best indicator of Bojko's post-injury earning capacity. This is so whether the part-time work was engaged prior to the injury or not so long as the yardstick (full-time employment) remains the same for both calculations.[6]

¶ 23 Simply put, the determination of Bojko's average monthly wage at the time of injury operates to set the maximum award, not to fix the type of work that can be considered when determining post-injury earning capacity. *See Warren,* 202 Ariz. at 12–13, ¶¶ 14, 15, 39 P.3d at 536–37; *Schmitz,* 26 Ariz.App. at 405–06, 549 P.2d at 185–86. The idea is to ensure that the claimant is compensated for lost ability to earn attributable to his injury, not guarantee a particular type of employment. *Hardware Mut. Cas. Co. v. Indus. Comm'n,* 17 Ariz.App. 7, 9, 494 P.2d 1353, 1355 (1972). Thus, the ALJ erred when he concluded that the equal measure rule precluded consideration of Bojko's self-employment earnings in calculating post-injury earning capacity.

## 2. The Open Labor Market

¶ 24 We now turn to Schuck's second argument challenging the exclusion of Bo-

---

6. Also, to include or exclude earnings from the post-injury earning capacity determination based on whether post-injury earnings from a position held by Bojko at the time of injury were covered by the Act at the time of injury is counter to the policy underlying the Act. Such an application provides a disincentive for a self-employed person to opt-in to workers' compensation insurance. A sole proprietor is only covered by the Act if he opts-in to the company's coverage. A.R.S. § 23–901(i) (Supp.2005). Such an application would also be an incentive for workers to work at jobs that are not subject to the Act. This is inconsistent with the intent of the Act. "We cannot encourage or allow workers to use the 'underground economy' as an adjunct to workers' compensation benefits." *Pima County,* 149 Ariz. at 45, 716 P.2d at 414.

jko's self-employment earnings: that the ALJ erred by finding that Bojko's actual earnings could not be considered because his position at D & D did not exist in the open, competitive labor market. We agree that the ALJ erred.

¶ 25 In making this ruling the ALJ stated that "[i]n this matter, both labor market consultants agreed that applicant's position at D & D Builders is not available in the open and competitive labor market. Thus, the undersigned concludes that it cannot be used as a measure of applicant's earning capacity in this instance." In determining a claimant's earning capacity, however, the statute mandates that "consideration *shall* be given, among other things, to . . . the type of work the injured employee is able to perform subsequent to the injury [and] any wages received for work performed subsequent to the injury." A.R.S. § 23–1044(D) (emphasis added). There is nothing in the statutory mandate that limits consideration of "the type of work the injured employee is able to perform" to those positions that are available on the open market. The statute sets the scope of what the ALJ is to consider. *See Bilke v. State*, 206 Ariz. 462, 464, ¶ 11, 80 P.3d 269, 271 (2003) (The court must apply the clear language of the statute unless it "would lead to impossible or absurd results."). The legislative directive does not limit the scope to positions on the open market as the ALJ determined. A.R.S. § 23–1044(D).

¶ 26 Additionally, it is well-established that a claimant's actual post-injury earnings raise a presumption of commensurate earning capacity. *See, e.g., Ariz. Pub. Serv. Co.*, 16 Ariz.App. at 276, 492 P.2d at 1214. This is not limited to positions on the open market, although what an employee can make on the open market is the final determination to be made in this regard. As the Arizona Supreme Court has held:

> The universally recognized ultimate issue in determining loss of earning capacity is: to determine as near as possible whether in a competitive labor market the subject in his injured condition can probably sell his services and for how much.

*Zimmerman v. Indus. Comm'n*, 137 Ariz. 578, 583–84, 672 P.2d 922, 927–28 (1983). This determination does not necessarily preclude *consideration* of post-injury earnings that are not on the open market:

> We, therefore, hold that where an injured workman has post-injury earnings, *lack of evidence of employability by other employers does not by itself preclude a finding of earning capacity.* Our holding is consistent with the numerous pronouncements of Arizona courts that evidence of post-injury earnings raises a presumption, although not necessarily conclusive, of post-injury earning capacity. *State Compensation Fund v. Cramer,* [13 Ariz.App. 103, 474 P.2d 462 (1970)]; *Maness v. Industrial Commission,* 102 Ariz. 557, 434 P.2d 643 (1967); *Laird v. Industrial Commission,* 8 Ariz.App. 196, 445 P.2d 79 (1968); *Gutierrez v. Industrial Commission,* 8 Ariz.App. 477, 447 P.2d 569 (1968); *Allen v. Industrial Commission,* 87 Ariz. 56, 347 P.2d 710 (1959); *Barnard v. Industrial Commission,* 91 Ariz. 1, 368 P.2d 749 (1962).

*Cramer v. Indus. Comm'n*, 19 Ariz.App. 379, 381–82, 507 P.2d 991, 993–94 (1973) (footnote omitted) (emphasis added). Further, to the extent this legal policy was used by the ALJ to exclude *consideration* of actual earnings it would be contrary to the legislative mandate that "*consideration shall be given* . . . to the type of work the injured employee is able to perform subsequent to the injury [and] any wages received." A.R.S. § 23–1044(D) (emphasis added). Had the legislature chosen to adopt a policy excluding *consideration* of positions that are not on the open market, it could have done so and can still do so as to future cases. *See State v. Korzep,* 165 Ariz. 490, 493, 799 P.2d 831, 834 (1990) (When interpreting a statute, "[w]e give words their usual and commonly understood meaning unless the legislature clearly intended a different meaning."). However, the legislative mandate is to the contrary. This is consistent with the Arizona Supreme Court's holding that the final *determination* of loss of earning capacity be based "as near as possible" on what a claimant "can probably sell his services and for how much" on the open market. *Zimmerman,* 137 Ariz. at 584, 672 P.2d at 928.

¶ 27 We further note that Bojko's actual earnings at issue here are from self-employment. We emphasize that this is not a case of sheltered employment, which is precluded from consideration under other cases. *See Allen v. Indus. Comm'n*, 87 Ariz. 56, 347 P.2d 710 (1959). "Sheltered employment" embodies a concept that a position is made available by an employer for which an employee would not qualify but for the good graces of the employer. As recognized in *Allen,* and subsequently, such circumstances leave an employee "a captive of the sheltered job and of the abrogable policy or transient attitude of one employer." *Doles v. Indus. Comm'n*, 167 Ariz. 604, 608, 810 P.2d 602, 606 (App.1990). Here, Bojko is self-employed and literally obtains his work on the open labor market. He is not subject to the whims of any particular employer.[7] Thus, in this case dealing with self-employment, the ALJ erred in excluding *consideration* of actual earnings based on an open labor market theory.

### 3. Profits v. Earnings

¶ 28 Finally, the ALJ also excluded Bojko's self-employment earnings on the grounds that these were business profits that should not be used to characterize Bojko's earning capacity and would result in endless litigation. The ALJ explained:

> If only the profit from one year is used, then each year would require the filing of a Petition for Rearrangement by applicant or defendants. This would result in endless, ongoing, and continuous litigation regarding this matter. In the interest of judicial economy such an analysis would be inappropriate.[8]

We find this to be error for the following reasons.

¶ 29 As a preliminary matter, we note that the fact that there may or may not be subsequent rearrangement proceedings is no reason to not consider whether actual earnings reflect earning capacity. In fact, the workers' compensation statutes contemplate such situations and are designed to enable an employer or claimant to adjust an award under the reopening and rearrangement statutes, A.R.S. §§ 23–1061(H), – 1044(F), respectively.[9] Under these statutes, res judicata is suspended to vest the ICA with jurisdiction to adjust final awards if there is a change in a claimant's earning capacity attributable to his injury. *Pima County Bd. of Supervisors v. Indus. Comm'n*, 149 Ariz. 38, 43–44, 716 P.2d 407, 412–13 (1986) ("In order to effectuate the remedial purposes of the act and to prevent perverse results, the compensation law has both reopening and rearrangement provisions. These statutes are exceptions to the doctrine of res judicata.") (footnote omitted); *Stainless Specialty Mfg. Co. v. Indus. Comm'n*, 144 Ariz. 12, 19, 695 P.2d 261, 268 (1985) (holding that res judicata does not apply to workers' compensation cases the same as in general civil cases and will not bar reopening a claim under certain circumstances).

¶ 30 We do not quarrel with the proposition that monies "received by [claimant] as *profits* accruing from his capital investment, *independent of his own efforts . . .* should not be considered wages." *Ins. Co. of N. Am. v. Indus. Comm'n*, 116 Ariz. 21, 25, 567 P.2d 337, 341 (App.1977) (emphasis added). But the converse is also true: monies generated in a manner that is not *independent* of a claimant's efforts should be considered to determine whether they reflect earning capacity. *See id.* Further, actual post-

---

7. As we discuss subsequently, *infra* ¶ 29, if Bojko is unable to continue to succeed in his own business, a petition for rearrangement may be appropriate.

8. The ALJ also reasoned that "[to] include the profit from D & D Builders, owned jointly, by applicant and his spouse, as applicant's earning capacity and basing that on applicant's past earnings in the year 2004 would inappropriately characterize applicant's earnings in May 2002 when applicant's claim was closed." However, neither side contends that we should ignore earning capacity during the time from May 2002 to the ALJ's May 2005 decision. Indeed, the language of the statute requires the court to consider what type of work Bojko is able to perform. A.R.S. § 23–1044(D); *see supra* ¶¶ 17, 25–26.

9. These statutes set forth limited circumstances under which reopening and rearrangement may be had.

injury earnings will create a presumption of commensurate earning capacity. *Shroyer v. Indus. Comm'n,* 98 Ariz. 388, 392, 405 P.2d 875, 878 (1965) (quoting 2 A. Larson, Larson's Workmen's Compensation Law § 57.21 (1952)). However, both Bojko and Schuck are entitled to rebut this presumption "by evidence independently showing incapacity or explaining away the post-injury earnings as an unreliable basis for estimating capacity." Id.; *accord Ariz. Pub. Serv. Co.,* 16 Ariz.App. at 276, 492 P.2d at 1215.

¶ 31 In *Mail Boxes,* the Arizona Supreme Court held that "[t]he best way to measure the lost earning capacity of a sole proprietor is by the market value of the services performed." 181 Ariz. at 122–23, 888 P.2d at 780–81. *Mail Boxes* was a case in which a sole proprietor had no net earnings, or profits. The court of appeals held that because there was no "earned income" in the business, there was no actual wage attributable to the owner. *Id.* at 121, 888 P.2d at 779. The Arizona Supreme Court rejected that proposition. *Id.* at 121–23, 888 P.2d at 779–81. Whether there was profit or not, a market value for the services rendered by the sole proprietor should be determined. *Id.*

¶ 32 However, here the ALJ did not use either the market value of the services that Bojko performed, nor did the ALJ attempt in any other manner to determine whether the monies generated through D & D "represented compensation for services as distinguished from dividends on his invested capital or a return of this capital." *Ins. Co. of N. Am.,* 116 Ariz. at 25–26, 567 P.2d at 341–42. As in *Mail Boxes,* simply because there is or is not profit does not determine whether there is a market value for the services rendered. Based on the definition in *Insurance Co. of North America,* 116 Ariz. at 25–26, 567

P.2d at 341–42, what one calls "profit" may actually be a reflection of market value and earning capacity if the monies are generated based upon the claimant's effort. The ALJ must apply the market value test from *Mail Boxes* and the definition of profit described herein to make this determination.[10]

¶ 33 We particularly note that *Mail Boxes* expressly states that "[i]n most workers' compensation cases, the best method of determining lost earning capacity is to examine the worker's past wages." Id. at 122, 888 P.2d at 780. In *Mail Boxes,* however, the claimant did "not have past wages with which to determine his [loss of earning capacity]." Id. Here, with $69,000 in monies that one expert attributed to Bojko's efforts as a building contractor, there is no dispute that the monies were generated. What is disputed is whether the monies represent "profits accruing from his capital investment *independent* of [claimant's] own efforts," *Insurance Co. of North America,* 116 Ariz. at 25, 567 P.2d at 341 (emphasis added), or if they are earnings that are indicia of Bojko's earning capacity. The ALJ erred when he failed to make this determination.

¶ 34 On remand the ALJ should first apply the presumption that actual earnings determine earning capacity. In doing so the test for distinguishing profits from earnings should be applied. If the presumption as to earnings is rebutted, then the ALJ should apply the market value test described in *Mail Boxes.*[11] Whether there are earnings or not, there is value that is being added by Bojko's services.

### Conclusion

¶ 35 Based on the foregoing, we reverse and remand for further proceedings consistent with this opinion.

---

10. Moreover, the fact that Bojko owns D & D with his wife does not prevent the ALJ from distinguishing business profit from Bojko's actual earnings.

11. It should be noted that the market value test from *Mail Boxes* does not necessarily preclude consideration of actual earnings that some may characterize as "profit." For instance, assume a claimant is paid on a commission basis. His earnings are essentially a reflection of how much "profit" he generates for the company or employer. If these earnings, or "profits," are not

independent of his efforts, then they may be evidence of earning capacity. The key is that the monies generated are "independent of [claimant's] own efforts." *Ins. Co. of N. Am.,* 116 Ariz. at 25, 567 P.2d at 341 (citing *Clingan v. Fairchance Lumber Co.,* 166 Pa.Super. 331, 71 A.2d 839, 840 (1950) ("The general rule is that profits derived from a business are not to be considered as earnings and cannot be accepted as a measure of earning power unless they are almost entirely the direct result of personal management and endeavor.")).

CONCURRING: MAURICE PORTLEY, Presiding Judge and SUSAN A. EHRLICH, Judge.